STEPHANIE M. HINDS (CABN 154284)
United States Attorney

THOMAS A. COLTHURST (CABN 99493)
Chief, Criminal Division

LLOYD FARNHAM (CABN 202231)
Assistant United States Attorney

      450 Golden Gate Avenue, Box 36055
      San Francisco, California 94102-3495
      Telephone: (415) 436-7200
      FAX: (415) 436-7234
      Lloyd.farnham @ usdoj.gov

Attorneys for United States of America

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 19-CR-00376 RS |
| Plaintiff, | UNITED STATES' SENTENCING MEMORANDUM |
| v. | |
| THOMAS HENDERSON, | Sentencing Date: December 5, 2022 |
| Defendant. | Hon. Richard Seeborg<br>In person, 10:00 a.m. |

## INTRODUCTION

The United States respectfully submits this Sentencing Memorandum in advance of the

sentencing hearing for defendant Thomas Henderson. Pursuant to a plea agreement, Henderson has

entered a plea of guilty to two counts of the indictment, charging him with conspiracy to commit wire

fraud in violation of 18 U.S.C. § 1349 and making a false statement to a government agency in violation

of 18 U.S.C. § 1001(a)(2). In the plea agreement, the parties agreed to a Sentencing Guidelines

calculation that, with acceptance of responsibility, results in an offense level of 28 or 30 depending on

the loss amount as determined by the Court. The Presentence Report prepared by the Probation Office

calculates a total Offense Level of 30. The government has agreed to recommend a sentence of no more

than four years in prison, a variance from the low end of the sentence corresponding to Offense Level 30 as determined by the Probation Office.

Henderson was charged in 2019 with orchestrating a large-scale investment fraud involving the United States visa program known as the EB-5 program. Through the entity he owned and controlled, San Francisco Regional Center ("SFRC"), Henderson raised more than $100 million from more than 200 foreign investors. Henderson claims that when he started soliciting EB-5 investors in 2011, he believed he had a chance to bring investments into Oakland, and with it the jobs that the EB-5 program required. But Henderson himself has admitted that by June 2014 it had evolved into a fraud.

From 2014 through March of 2017, when this Court appointed a receiver in the SEC civil action to take over and salvage the value from the failed entities, Henderson was in charge of a complex new twist on the classic Ponzi scheme. He knowingly used tens of millions of new investor money— obtained through false statements about past success and the future safety and use of the raised funds— to keep the prior investors' projects afloat. What the defense characterizes as an administrative failure or accounting mix-up, or even somehow "allowed" by the offering documents, was actually a years-long scheme in which Henderson repeatedly formed new EB-5 ventures then used the money to prop up Callsocket I. Throughout, he and those acting with him or at his direction relentlessly raised money from unsuspecting and vulnerable foreign investors even though he knew that the money would be diverted to pay for other projects and failing businesses.

The government acknowledges the mitigating factors in this case that warrant a variance from the applicable guidelines range, 97 to 121 months, including his age and minor health issues and his lack of criminal history. However, the far-reaching scope of the conduct and the magnitude of both the financial and intangible losses inflicted on the victims in this case warrant a substantial sentence. The government recommends that the defendant Henderson be sentenced to four years in prison.

## FACTUAL BACKGROUND

The overall scheme to defraud led and managed by defendant Thomas Henderson is described in detail in the thorough Presentence Report. The government has no outstanding objections to the PSR and requests that the Court adopt its findings.

The indictment charges a years-long scheme orchestrated by Henderson in connection with his

operating of the San Francisco Regional Center (SFRC) from 2011 through 2017.  As explained in the PSR, SFRC raised funds from investors through the USCIS EB-5 visa program.  Investors in each of the seven separate EB-5 projects were told and believed—and the EB-5 program required—that investor money would be used for the project associated with the particular investment and investor.  However, by 2014, Henderson and SFRC were using new investor money for other purposes, including prior projects that had run out of money, acquiring property owned in significant part by Henderson or other entities he controlled, and separate business ventures either unrelated, or only tangentially-related, to the investors' businesses.  By 2014, as he continued to raise money for new projects, Henderson was misleading foreign investors and the U.S. Citizenship and Immigration Services about how the projects were being funded and the use of the funds.  Though he raised more than $60 million for three later projects, Callsocket III, NA3PL, and California Gold Medal, only a tiny portion of those funds were retained and spent by those businesses.

The following table shows the total amount of funds raised by all the SFRC entities:

| EB-5 Project | Short | Beg Date | End Date | No. Inv. | Capital Cont. | Synd. Fees | Total |
|---|---|---|---|---|---|---|---|
| Comp. Care of Oakland LP | CCOO | 12/21/2011 | 12/18/2013 | 8 | $4,001,000 | $309,325 | $4,310,325 |
| Callsocket LP | CS | 4/9/2012 | 6/24/2013 | 36 | $17,500,000 | $1,608,660 | $19,108,660 |
| Callsocket II LP | CS II | 11/13/2012 | 3/10/2014 | 32 | $16,000,000 | $1,555,964 | $17,555,964 |
| Callsocket III LP | CS III | 12/2/2013 | 1/8/2016 | 40 | $19,948,140 | $1,751,676 | $21,699,816 |
| North America 3PL, LP | NA3PL | 5/28/2014 | 3/29/2016 | 42 | $20,991,934 | $2,151,385 | $23,143,319 |
| California Gold Medal LP | CGM | 9/4/2015 | 1/5/2017 | 47 | $23,461,927 | $1,442,464 | $24,904,391 |
| West Oakland Plaza LP | WOP | 9/15/2015 | 9/16/2016 | 4 | $1,996,404 | $199,906 | $2,196,310 |
| | | | | | | | |
| | | | | | $103,899,405 | $9,019,381 | $112,918,786 |

Henderson controlled the use and disposition of all these funds except for about $15.5 million in funds from investors in California Gold Medal that were still in an escrow company account when the receiver was appointed in March 2017.  The table above also shows the amount of so-called "syndication fees" raised from investors.  The syndication fees were to be used by SFRC to cover marketing expenses, administration of SFRC in its role as a sponsor for the EB-projects, and other expenses not directly related to the EB-5 businesses.  Henderson transferred far more than $9 million from the investors into the accounts of SFRC, where the money was comingled, spent on other projects,

and used for Mr. Henderson's personal benefit.

In order to estimate the intended loss attributable to Henderson as a result of the scheme, the government analyzed how investor funds were used in three of the EB-5 projects that were later in time and were the entities from which the most funds were diverted by Henderson to pay for older projects or outside businesses:  Callsocket III, North America 3PL ("NA3PL"), and California Gold Medal.

As described in the affidavit of David Pinck, attached hereto as Exhibit 1, the following amounts of investor money was diverted from each of those three projects:

| | |
|---|---|
| CSIII: | $15,596,809.03 |
| NA3PL: | $16,505,056.51 |
| CGM: | $1,947,090.13 |
| Total: | $34,048,955.67 |

In connection with the sentencing proceedings, the government submits the following documents, obtained by government investigators in the course of this investigation and produced to the defendant Henderson as part of the discovery:

An email dated June 20, 2014, in which Matthew Henderson, Thomas Henderson's son, explains to co-defendant Peter Hu the dire financial situation for SFRC and the Callsocket projects, stating that more investor funds are needed immediately "to keep the lights on."  (Exhibit 2).

A "balance sheet" submitted and signed by Henderson as part of a mortgage application for a house that Henderson purchased in 2015 (in part with investor funds), in which Henderson confirmed his belief that he had large personal ownership interests, or outright ownership, of certain Oakland commercial buildings that were purchased with EB-5 investor funds.  (Exhibit 3).

A.    **Relevant Terms of the Plea Agreement**

On July 21, 2021, defendant Henderson entered a guilty plea to two counts in the Indictment: Count Two charging him with violation of 18 U.S.C. § 1349, conspiracy to commit wire fraud, and Count Sixteen charging Henderson with violation of 18 U.S.C. § 1001(a)(2), false statement to USCIS. Though the conspiracy charged in Court 2 alleges that Henderson engaged in a conspiracy from 2011 to March 2017, in the agreed facts Henderson admits that he joined a criminal conspiracy as of no later than June 2014.

In the plea agreement Henderson admits that at least by the middle of 2014, he was directing investor funds to be used for purposes and projects other than the projects specifically pitched to the investors. He also admits that investors were not told that their investments were being used for other projects. Henderson also admits that beginning in June 2014 he conspired with co-defendant Peter Hu to raise investor funds knowing that the funds would be used for purposes other than the investors' EB-5 projects. Henderson admits that he knew that Hu showed altered bank statements to investors in around October 2014. Henderson also admitted that from August 2016 to January 2017 he conspired with co-defendant Cooper Lee to divert more investor funds away from California Gold Medal investors, through companies that Lee owned or controlled, to be used for other EB-5 projects and other purposes.

As part of the agreement, the government agreed to recommend a sentence of no more than four years in prison, and if necessary to make that recommendation seek a variance from the Sentencing Guidelines range as determined by the Court, unless the defendant violates the terms of the agreement above or fails to accept responsibility for the offense conduct.

## DISCUSSION

### I. Guidelines Calculation

The Presentence Report correctly calculates the applicable Total Offense Level as 30, with a corresponding sentencing range of 97 to 121 months.

The offense level in this case appropriately includes the following adjustments based on the offense conduct. First, the base offense level is increased by 22 levels based on an intended loss of more than $25 million under USSG §2B1.1(b)(1)(L). Second, the offense level is increased by 2 levels, under USSG §2B1.1(b)(2)(A)(i), because the offense involved 10 or more victims. Finally, the offense level is adjusted by 2 levels because of Henderson's role as a leader, manager, and supervisor of the criminal activity under USSG § 3B1.1(c).

### II. Loss Calculation

The Presentence Report adopts the government estimation of intended loss, based on the diversion from the last three large EB-5 projects, from which considerable amounts of the funds from investors in those projects was diverted away for uses outside those projects.

Under the Guidelines, loss "is the greater of actual or intended loss." U.S.S.G. § 2B1.1(b) Appl.

1   Note 3(A).  Actual loss "means the reasonably foreseeable pecuniary harm that resulted from the

2   offense." *Id.* Note 3(A)(i). Intended loss includes "the pecuniary harm that the defendant purposely

3   sought to inflict."  *Id.* Note 3(A)(ii). Reasonably foreseeable pecuniary harm is monetary harm "that the

4   defendant knew or, under the circumstances, reasonably should have known, was a potential result of the

5   offense."  *Id.* Notes 3(A)(iii) and (iv).

6       "The guidelines do not present a single universal method for loss calculation under § 2B1.1."

7   *United States v. Zolp*, 479 F.3d 715, 718 (9th Cir. 2007). The Court "need only make a reasonable

8   estimate of the loss." U.S.S.G. § 2B1.1(b) Note 3(C).  The Ninth Circuit has said that "district courts

9   should 'take a realistic, economic approach to determine what losses the defendant truly caused or

10  intended to cause, rather than the use of some approach which does not reflect the monetary loss.'"

11  *United States v. Martin*, 796 F.3d 1101, 1110 (9th Cir. 2015).

12      Given the nature of the fraud scheme in this case, in which Henderson directed nearly all

13  investor funds to be transferred through the accounts held in the name of SFRC, comingled without any

14  regard to the source of the funds, and without sufficient accounting or documentation to allow the proper

15  use of the funds, there is no straightforward method to calculate loss for the purposes of the Guidelines.

16  The government agrees that using the total investor contribution is not appropriate here, as it would be in

17  many investment fraud cases, because of the fact that some of the early ventures were operational

18  (primarily CCOO and Callsocket I) and the defendant could argue that losses during that period of time

19  were due to business failures rather than fraud.  (One could even argue that Callsocket I investors

20  actually benefited from the fraud, as Henderson pumped later unsuspecting investors' money into that

21  failing project.)  As a conservative, but legally appropriate and factually sound, method of calculating

22  loss the government determined the amounts that Henderson diverted from three projects.  It is likely

23  that significant funds were also diverted from other projects, and all the EB-5 projects and investors

24  were harmed by the diversion and fraudulent statements made to raise the money, but the nature of

25  Henderson's fraud makes it difficult to assign a measure of pecuniary harm to the entire venture.  In one

26  example of harm not included in the government's loss analysis, the four West Oakland Plaza investors

27  would have lost all their principal investments, which were almost immediately comingled with other

28  SFRC funds and spent by Henderson, if not for the recoveries received through the receiver.

Based on the calculation of diversion from Callsocket III, NA3PL, and CGM, the government asks the Court to adopt, as a reasonable estimate of the loss caused by Henderson's scheme, the loss as described in the Declaration of David Pinck.

The defendant has retained, through an application for CJA funds, an expert to do his own calculation of the loss, Anne Layne.[1]  Ms. Layne's report, and presumably her months of work, spends a considerable amount of time criticizing the work of SEC accountant Ellen Chen and the appointed receiver's forensic account Jay Crom.  This debunking relies on critiquing relatively small gaps in the records maintained by SFRC itself or relies disputing categorization of amounts as beyond the scope of the partnership agreements.  Those critiques have no bearing on the sentencing of Henderson, as the government does not rely on either of these analyses for its loss calculation.  But the government notes that the SEC did an extensive and thorough analysis of the data it could obtain through its investigative tools, taking only a few months at a point very early in the investigation, in order to seek a preliminary injunction to stop Henderson's ongoing fraud and protect the existing investors' capital.

Ms. Layne's critiques, more than six years after Ellen Chen submitted her analysis to the Court, are petty, irrelevant, and ineffective.  Any difficulty, then and now, to ascertain the true nature of the thousands and thousands of bank transactions involving investor money in scores of accounts directed exclusively by Henderson, lies entirely on Henderson.  In fact, many of the "observations" by Ms. Layne corroborate this key aspect of the fraud, including her observations about undocumented transfers, loans, and transactions, flawed accounting records, and disbursements from the investor escrow accounts without records provided by SFRC attributing them to the appropriate investor.  These facts also show that Henderson directed extensive and intentional comingling of investor funds to disguise the losses and misappropriate new funds to older projects and his own businesses.

Ms. Layne concludes that the "confirmed loss" in the case is about $4.8 million, apparently consisting primarily of the funds diverted to pay for the startup costs of the two restaurants, and the

---

[1] The defense also retained with CJA funds a purported expert in property valuations in an apparent attempt to blame the Court-appointed and supervised receiver for Henderson's crimes and the consequences these crimes had on investors. *See* Curtis Novy Report.  The conclusions of this report are completely unreliable, and Henderson's motives in seeking this work are suspect, but the report and its dubious conclusions are irrelevant to sentencing, and are not addressed in this memorandum.

1   amounts of CGM investor money diverted through co-defendant Cooper Lee's sham entities. Though

2   these losses are a direct result of the conduct that Henderson admits in his plea agreement, it is an

3   unreasonably low estimate of the intended loss in this case.

4   **III.    Legal Standard**

5          The overarching goal of a sentencing court is to impose a sentence that is sufficient to "reflect

6   the seriousness of the offense, promote respect for the law, and provide just punishment; to afford

7   adequate deterrence; to protect the public; and to provide the defendant with needed education or

8   vocational training, medical care, or other correctional treatment." *United States v. Ressam*, 679 F.3d

9   1069, 1088-89 (9th Cir. 2012) (en banc); *see United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008);

10  18 U.S.C. § 3553(a). The Court should begin the sentencing process by correctly calculating the

11  applicable Guidelines range and must "remain cognizant of them throughout the sentencing process."

12  *Gall v. United States*, 552 U.S. 38, 50 n.6 (2007). The Court should then consider the factors outlined in

13  Section 3553(a) to determine the appropriate sentence. *Ressam*, 679 F.3d at 1089. If the Court

14  determines that a sentence outside of the Guidelines range is warranted, it must ensure that the

15  "justification is sufficiently compelling to support the degree of the variance." Id. (internal quotation

16  omitted). "[A] major departure should be supported by a more significant justification than a minor

17  one." *Gall*, 552 U.S. at 50.

18         The Section 3553(a) factors are:

19              (1) the nature and circumstances of the offense and the history and
                characteristics of the defendant;
20
                (2) the need for the sentence imposed (A) to reflect the seriousness of the
21              offense, to promote respect for the law, and to provide just punishment for
                the offense; (B) to afford adequate deterrence to criminal conduct; (C) to
22              protect the public from further crimes of the defendant; and (D) to provide
                the defendant with needed educational or vocations training, medical care,
23              or other correctional treatment in the most effective manner;

24              (3) the kinds of sentences available;

25              (4) the kinds of sentence and the sentencing range established in the
                Guidelines;
26
                (5) any pertinent policy statement by the Sentencing Commission;
27
                (6) the need to avoid unwarranted disparities among defendants with
28              similar records who have been found guilty of similar conduct; and

1          (7) the need to provide restitution to any victims.

2  *See* 18 U.S.C. § 3553(a)(1)-(7).

3      **A.    Government Recommendation**

4          Several aspects of defendant Henderson's conduct in this case warrant a significant custodial

5  sentence.  First, putting aside the question of how much money Henderson directed to legitimate

6  expenses or illegally and fraudulently diverted, there is no question that Henderson's actions illustrated

7  that he acted with a deliberate intent to defraud the investors.  In October 2014, he and his son worked

8  with Peter Hu to show altered bank statements to concerned investors, a lie to make investors believe

9  that most their investment principal was still in the accounts of the EB-5 project, when in fact *nearly all*

10  the money had long been drained from that account.  *See,* PSR at ¶ ¶ 65-69.  Earlier, in June 2014,

11  Henderson knows of the dire financial situation that SFRC and the existing EB-5 projects Callsocket I

12  and II are facing, due to mismanagement and the use of funds on outside businesses and property

13  purchases, and Henderson knows that new investors are needed to "keep the lights on."  Exhibit 2.

14  Around this same time, Henderson viewed the properties that were purchased with diverted and

15  comingled funds as his own, not security for the investors' capital.  *See* Exhibit 3.  This is classic

16  investment fraud—false statements and omissions used to obtain money or property.  And in 2016,

17  when the walls are closing in further, and the SEC is investigating and monitoring the movement of

18  funds from the remaining solvent accounts, Henderson intentionally deceives the SEC by paying Cooper

19  Lee for sham contracts and invoices and directing him to route the money back to Henderson-controlled

20  accounts in order to keep diverting CGM investor money to other failing businesses.  Each of the

21  instances show that Henderson is not a victim of circumstance or failed judgment.  The lies he told were

22  not matters of perception or honest mistakes; he acted with fraudulent intent.

23          The magnitude of the harm he inflicted on the victims of this fraud, the foreign investors, also

24  warrants punishment and deterrence under the sentencing factors.  Henderson's scheme relied on a

25  steady stream of money from vulnerable victims who were motivated to make the investments in part by

26  obtaining residency, but who also had very little ability to properly vet or investigate the false promises

27  made by Henderson and his proxies.  The investors certainly wanted the potential immigration benefits

28  that could result from their investments, but they were also promised that their money would be used to

1  fund real business, and a business that was following the business plan on which they were pitched. The

2  investors relied on the accuracy and legitimacy of the claims made by Henderson and SFRC regarding

3  the EB-5 projects for two interrelated reasons: (1) they wanted to have the opportunity for permanent

4  residency though the creation of jobs by a successful investment (without jobs created they would not

5  get their green cards), and (2) they were seeking the safest investment they could for the considerable

6  investment the EB-5 program required. The investors did not want to invest in an unsuccessful business,

7  or in a regional center leader that sat atop a crumbling empire, because if the businesses failed after their

8  investments, they would lose both their money and their families' chance to obtain residency.

9      Because most of the investors in SFRC will not obtain a green card, the intangible harm to

10  investors and their families is enormous. Some investors may try to use money recovered from through

11  the receiver, plus significant additional capital, to invest in a new EB-5 project, but that road will likely

12  be long and difficult, because they lost years with their fortunes tied to SFRC and Henderson. Others

13  will not be able to raise the funds to try again. Its irrelevant to the magnitude of the harm in this case

14  that the investors in the SFRC EB-5 projects accepted a level of risk. Henderson's fraud deprived them

15  of the ability to accurately assess that risk, and his fraudulent stewardship of their funds made it a virtual

16  certainty that investors would lose both their money and their most promising path to legal immigration

17  to the United States.

18      **B.    Conclusion**

19      The harm to the victims, the magnitude of the pecuniary harm, and the scope of the overall

20  scheme warrant a sentence that is both a general deterrent, and a just punishment to Henderson. Based

21  on the circumstances of this case, taking into account mitigating facts addressed in the PSR, the

22  government recommends a sentence of four years.

23  DATED: November 25, 2022                    Respectfully submitted,

24                                              STEPHANIE M. HINDS
25                                              United States Attorney

26                                              _____/s/_____
27                                              LLOYD FARNHAM
                                                Assistant United States Attorney
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 1

1  STEPHANIE M. HINDS (CABN 154284)
   United States Attorney
2
   THOMAS A. COLTHURST (CABN 99493)
3  Chief, Criminal Division

4  LLOYD FARNHAM (CABN 202231)
   Assistant United States Attorney
5
       450 Golden Gate Avenue, Box 36055
6      San Francisco, California 94102-3495
       Telephone: (415) 436-7200
7      FAX: (415) 436-7234
       Lloyd.Farnham @ usdoj.gov
8
   Attorneys for United States of America
9
                    UNITED STATES DISTRICT COURT
10
                  NORTHERN DISTRICT OF CALIFORNIA
11
                      SAN FRANCISCO DIVISION
12

13  UNITED STATES OF AMERICA,          )   CASE NO. 19-CR-00376 RS
                                       )
14            Plaintiff,               )   DECLARATION OF DAVID PINCK
                                       )   IN SUPPORT OF UNITED STATES'
15       v.                            )   SENTENCING MEMORANDUM
                                       )
16  THOMAS HENDERSON,                  )
                                       )
17            Defendant.               )
    _____)
18

19       I, David Pinck, hereby declare and state as follows:

20       **A.    Background**

21       1.    I am currently employed as an Investigative Analyst of the Diplomatic Security Service

22  ("DSS"), which is an agency of the United States Department of State, and I have been so employed for

23  more than eight years.  I am currently assigned to the Document and Benefit Fraud Task Force, which is

24  operated by the U.S. Department of Homeland Security.  This task force investigates sophisticated

25  immigration frauds in the San Francisco Bay Area, and as a participant in this task force I have received

26  and continue to receive specialized training and instruction from State Department officers who

27  specialize in money laundering, financial fraud, immigration fraud, and visa fraud.  Prior to DSS, I

28  worked for more than six years as an Investigator for the United States Department of Labor

investigating fraud and embezzlement.  I have a Master's in Criminal Justice from California State

University, Sacramento.

**B.    Objective and Methodology**

2.    I have participated in and supported the criminal investigation involving the San

Francisco Regional Center ("SFRC"), Thomas Henderson, and other related entities and individuals

since its inception.  As part of that work supporting this investigation, I have become familiar with

entities involved in the EB-5 visa program, the petitions and other materials submitted to the U.S.

Citizenship and Immigration Services ("USCIS"), and the financial accounts and institutions used by

SFRC, Henderson, and other entities, including all the limited partnerships and LLCs that were used as

the investor partnerships and job-creating entities for the EB-5 projects that were presented to USCIS by

SFRC.  Through the investigation I learned that SFRC was a sponsor for seven distinct EB-5 projects,

and each of those seven EB-5 projects obtained investments from individual foreign investors.

3.    Throughout the investigation I worked closely with the case agents on the case and a DSS

forensic accountant.  The financial investigation in this case involved obtaining and reviewing bank

account records for numerous bank accounts, reviewing escrow documents obtained from Central

Escrow, reviewing property transaction records including title company and loan records, and reviewing

the investor petition files that were provided to USCIS in connection with the seven EB-5 projects.  As

part of the overall investigation the forensic accountant and I prepared schedules of bank transactions in

order to learn the source and use of investor funds that were paid by foreign investors into the SFRC

EB-5 projects.  This work involved extensive scheduling and analysis of bank transactions, and

extensive work reviewing USCIS petition files to tie information in those files and correlating that

information to bank and escrow transactions in order to identify which financial transactions were

related to which individual investors

4.    For the purposes of the upcoming sentencing hearing in this case, I relied on the work

that was done in the investigation by me and the forensic accountant in order to calculate an estimate of

the amount of investor funds that were diverted from three of the EB-5 projects:  CALLSOCKET III,

NA3PL, and CALIFORNIA GOLD MEDAL ("CGM").  This estimate was obtained by tracing the flow

of investor funds to determine which downstream accounts the money was transferred into or finally

1  spent from.  All investor funds were forensically traced by a forensic accountant in accordance with

2  commonly established methods of forensic accounting, including the Specific Item ("Spec Item")

3  method of proof, and the First-in, First-out ("FIFO") method.

4       5.     Financial records we analyzed included the investor petition files submitted to USCIS,

5  which include documentation of source and path of funds, and looking at those records allows us to

6  correlate the money wired into Central Escrow accounts with each investor.  Bank records were then

7  used to trace investor funds transferred from Central Escrow bank accounts to accounts associated with

8  the limited partnership entities for each EB-5 project.  Investor funds that were transferred to various

9  business accounts and entities, as identified in the attachments to this declaration, were considered

10  unrelated to the investor's EB-5 project company and were tallied as "Misdirected Funds".  Investor

11  money paid to people or entities expressly unrelated to the investor's given company were also tallied as

12  "Misdirected Funds".

13       6.     Many investors were charged a syndication fee, often about $50,000, on top of their

14  principal investment of $500,000.  During the investigation, I have learned that the syndication fee could

15  be used by SFRC for administrative purposes and therefore did not need to be spent on expenditures

16  related to the investor's EB-5 project.  Petition and financial records were used to tabulate the amount of

17  syndication fees received from each investor in CALLSOCKET III, NA3PL, and CGM, and these

18  amounts were subtracted from the total "Misdirected Funds" amounts—essentially "crediting" that

19  amount of funds over which SFRC had discretion—in order to determine the total amount of

20  misappropriation related to each of the three businesses.

21       **C.**     **Materials Considered**

22       7.     The following documents and records were used for this analysis:

23       8.     Financial records included bank statements, signature cards, deposit slips, checks

24  deposited, withdrawals, cancelled checks, wire transfers, loan applications, financial statements,

25  certificates of deposit, money market records, records revealing annual interest paid or accumulated,

26  monthly billing statements, money order purchases, letters of credit, loan agreements, appraisal reports,

27  notes or mortgages, settlement sheets, repayment records, lien documents, and loan correspondence

28  files. The financial records analyzed covered the period from approximately January 2008 through July

1    2019, and included data from American Express, Applied Bank, Bank of America, Capital One, Central

2    Escrow, Citibank, City National Bank, Comenity Bank, Community Bank of the Bay, Discover

3    Financial Services, Dudum Financial, East West Bank, EverBank, Fifth Third Bank, First National

4    Bank, HSBC Bank, JP Morgan Chase, Key Bank, Metropolitan Bank, Mid Valley Financial, Opus

5    Bank, Preferred Bank, Regions Bank, Summit Bank, Synchrony Bank, Thorofare Capital, Torrey Pines

6    Bank, U.S. Bank, and Wells Fargo Bank.

7    　　　　9.    Petition files submitted to U.S. Citizenship and Immigration Services ("USCIS") by the

8    San Francisco Regional Center ("SFRC") on behalf of the CALLSOCKET III, NA3PL, and CGM

9    investors, including Forms I-526, I-829, and I-485, articles of incorporation, secretary of state filings,

10    USCIS correspondence, stock purchase agreements, business plans, Targeted Employment Area (TEA)

11    justifications, source of funds records, path of funds records, bank statements and accompanying

12    financial records, and Request for Evidence (RFE) submissions. The petition files analyzed covered the

13    period from approximately September 2014 through approximately January 2017, and consisted of

14    documents obtained exclusively from USCIS.

15    　　　　10.    I reviewed the foregoing materials and relied upon consultation with forensic

16    accountants, DSS special agents, investigative analysts, and USCIS immigration officers to confirm my

17    understanding of these materials.

18    　　　　**D.    Investigative Findings**

19    　　　　11.    The review of records determined that there were 41 CALLSOCKET III investors, 42

20    NA3PL investors, and 48 CGM investors.  The CALLSOCKET III bank account in the name of

21    CALLSOCKET III, LP received $20,497,275 in principal, and $1,702,526 in syndication fees, for a total

22    of $22,199,801 (ATTACHMENT 1).  The NA3PL bank account in the name of NA3PL, LP received

23    $20,491,934 in principal, and $1,911,901 in syndication fees, for a total of $22,403,835

24    (ATTACHMENT 2).  The CGM bank accounts in the name of CALIFORNIA GOLD MEDAL, LP

25    received $24,023,792 in principal, and $1,209,181 in syndication fees; however, only $8,485,507 in

26    principal, and $1,090,161 in syndication fees ever left the escrow account, for a total of $9,575,668

27    (ATTACHMENT 3).

28    　　　　12.    Forensic tracing of CALLSOCKET III investor money determined that $17,299,335 was

1    misdirected into unrelated business accounts and/or spent on unrelated expenses (ATTACHMENT 1).

2    After backing out the $1,702,526 in CALLSOCKET III syndication fees, the total misappropriation of

3    CALLSOCKET III investor funds was determined to be $15,596,809 (ATTACHMENT 1).

4         13.    The NA3PL tracing determined that $18,416,957 of NA3PL investor money was

5    misdirected into unrelated business accounts and/or spent on unrelated expenses (ATTACHMENT 2).

6    The $1,911,901 in NA3PL syndication fees was likewise subtracted from this amount, bringing the total

7    misappropriation of NA3PL investor funds to $16,505,056 (ATTACHMENT 2).

8         14.    Forensic tracing of CGM funds showed that $3,037,251 was misdirected into unrelated

9    business accounts and/or spent on unrelated expenses (ATTACHMENT 3).  After backing out the

10   $1,090,161 in CGM syndication fees, the total misappropriation of CGM investor funds was determined

11   to be $1,947,090 (ATTACHMENT 3).

12        15.    Based on the above analysis, I estimate the total misappropriation of CALLSOCKET III,

13   NA3PL, and CGM investor funds is $34,048,955.

14        16.    I declare under penalty of perjury that the foregoing is true and correct.  Executed on

15   November 22, 2022, in San Francisco, California.

16   DAVID M PINCK    Digitally signed by DAVID M PINCK
                      Date: 2022.11.22 13:54:48 -08'00'
17   _____

18   David Pinck

**Callsocket III, LP**
**Investor Funds**

| # | Investor | Principal | Syndication Fees | TOTAL INVESTMENT WITHDRAWN |
|---|---|---|---|---|
| 1 | ZH | $500,000.00 | $49,100.00 | $549,100.00 |
| 2 | ZH | $500,000.00 | $49,060.00 | $549,060.00 |
| 3 | ZH | $500,000.00 | $49,100.00 | $549,100.00 |
| 4 | LA | $500,000.00 | $49,100.00 | $549,100.00 |
| 5 | LI | $500,000.00 | $49,050.00 | $549,050.00 |
| 6 | ZE | $500,000.00 | $49,050.00 | $549,050.00 |
| 7 | ZH | $500,000.00 | $49,050.00 | $549,050.00 |
| 8 | C | $500,000.00 | $0.00 | $500,000.00 |
| 9 | PE | $500,000.00 | $15.00 | $500,015.00 |
| 10 | H | $500,000.00 | $49,100.00 | $549,100.00 |
| 11 | C | $500,000.00 | $49,100.00 | $549,100.00 |
| 12 | H | $500,000.00 | $49,099.00 | $549,099.00 |
| 13 | ZH | $500,000.00 | $36,853.92 | $536,853.92 |
| 14 | Y | $500,000.00 | $49,055.00 | $549,055.00 |
| 15 | Y | $500,000.00 | $49,135.00 | $549,135.00 |
| 16 | C | $500,000.00 | $49,099.00 | $549,099.00 |
| 17 | Y | $500,000.00 | $49,175.00 | $549,175.00 |
| 18 | ZH | $500,000.00 | $49,079.00 | $549,079.00 |
| 19 | ZH | $500,000.00 | $49,099.00 | $549,099.00 |
| 20 | LI, | $500,000.00 | $49,075.00 | $549,075.00 |
| 21 | N | $500,000.00 | $49,050.00 | $549,050.00 |
| 22 | Z | $500,000.00 | $37,209.89 | $537,209.89 |
| 23 | H | $500,000.00 | $49,135.00 | $549,135.00 |
| 24 | ZH | $450,000.00 | $0.00 | $450,000.00 |
| 24 | ZH | $50,000.00 | $50,000.00 | $100,000.00 |
| 25 | YB | $500,000.00 | $49,996.57 | $549,996.57 |
| 26 | C | $500,000.00 | $50,024.00 | $550,024.00 |
| 27 | ZH | $500,000.00 | $50,000.00 | $550,000.00 |
| 28 | S | $500,000.00 | $49,099.00 | $549,099.00 |
| 29 | LI | $500,000.00 | $50,074.00 | $550,074.00 |
| 30 | W | $500,000.00 | $49,135.00 | $549,135.00 |
| 31 | W | $500,000.00 | $49,050.00 | $549,050.00 |
| 32 | Y | $499,015.00 | $0.00 | $499,015.00 |
| 33 | C | $499,135.00 | $50,000.00 | $549,135.00 |
| 34 | H | $499,125.00 | $0.00 | $499,125.00 |
| 35 | D | $500,000.00 | $50,024.00 | $550,024.00 |
| 36 | JE | $500,000.00 | $49,135.00 | $549,135.00 |
| 37 | Y | $500,000.00 | $50.00 | $500,050.00 |
| 38 | TA | $500,000.00 | $50,000.00 | $550,000.00 |
| 39 | XI | $500,000.00 | $50.00 | $500,050.00 |
| 40 | JI | $500,000.00 | $49,099.00 | $549,099.00 |
| 41 | ZH | $500,000.00 | $50,000.00 | $550,000.00 |
| | | **$20,497,275.00** | **$1,702,526.38** | **$22,199,801.38** |

| Callsocket III Misdirected Funds | |
|---|---|
| Destination Account/Entity | Amount |
| SFRC (Op) EWB #3213 | $9,680,000.00 |
| SFRC CBB #2980 | $77,000.00 |
| SFRC CBB #3590 | $40,433.42 |
| BHD, LLP EWB #2983 | $287,958.44 |
| CS II, LP EWB #3866 | $1,193,211.12 |
| CS, LP EWB #3288 | $1,847,542.39 |
| CS HOLDING CO EWB #6398 | $607,000.00 |
| NA3PL, LLC EWB #4351 | $285,672.79 |
| CS, LP EWB #4849 | $1,357,455.48 |
| SFRC (PAYROLL) EWB #4807 | $432,500.00 |
| TESH, LLC EWB #7008 | $86,482.97 |
| NA3PL, LP EWB #6927 | $15,000.00 |
| TMH EWB #8222 | $129,000.00 |
| Aileen Yen EWB CD #8314 | $346,335.81 |
| SFRC EWB CD #9196 | $502,957.70 |
| JL GATEWAY EWB #8451 | $38,500.00 |
| TESH (PAY) EWB #7073 | $37,000.00 |
| QIAOYAN CHEN EWB #8972 | $278,285.29 |
| CALLTEKS (PAY) EWB #8782 | $28,000.00 |
| CALLTEKS JPMC AZ #9775 | $8,200.00 |
| Magic Ear | $20,800.00 |
| | **$17,299,335.41** |

| TOTAL CALLSOCKET III MISAPPROPRIATION | |
|---|---|
| Misdirected Funds = | $17,299,335.41 |
| Syndication Fees = | ($1,702,526.38) |
| **TOTAL MISAPPROPRIATION =** | **$15,596,809.03** |

ATTACHMENT 1

**NA3PL, LP**
**Investor Funds**

| # | Investor | Principal | Syndication Fees | TOTAL INVESTMENT WITHDRAWN |
|---|---|---|---|---|
| 1 | C | $499,135.00 | $0.00 | $499,135.00 |
| 2 | C | $500,000.00 | $59,149.00 | $559,149.00 |
| 3 | C | $499,129.00 | $0.00 | $499,129.00 |
| 4 | D | $500,000.00 | $57,950.00 | $557,950.00 |
| 5 | Di | $500,000.00 | $59,100.00 | $559,100.00 |
| 6 | Fu | $500,000.00 | $59,125.00 | $559,125.00 |
| 7 | G | $500,000.00 | $59,074.00 | $559,074.00 |
| 8 | H | $500,000.00 | $59,150.00 | $559,150.00 |
| 9 | H | $500,000.00 | $58,809.00 | $558,809.00 |
| 10 | H | $500,000.00 | $59,099.00 | $559,099.00 |
| 11 | H | $500,000.00 | $56,549.00 | $556,549.00 |
| 12 | H | $499,125.00 | $0.00 | $499,125.00 |
| 13 | Ji | $499,155.00 | $59,955.00 | $559,110.00 |
| 14 | Li, | $499,099.00 | $0.00 | $499,099.00 |
| 15 | Li, | $499,055.00 | $0.00 | $499,055.00 |
| 16 | Li, | $500,000.00 | $48,920.00 | $548,920.00 |
| 17 | Li, | $500,000.00 | $60,050.00 | $560,050.00 |
| 18 | Li | $500,000.00 | $60,024.00 | $560,024.00 |
| 19 | Li | $500,000.00 | $59,125.00 | $559,125.00 |
| 20 | Li | $500,000.00 | $60,050.00 | $560,050.00 |
| 21 | Li | $500,000.00 | $0.00 | $500,000.00 |
| 22 | Lu | $500,000.00 | $59,300.00 | $559,300.00 |
| 23 | M | $499,099.00 | $0.00 | $499,099.00 |
| 24 | M | $500,000.00 | $59,125.00 | $559,125.00 |
| 25 | N | $500,000.00 | $59,050.00 | $559,050.00 |
| 26 | N | $500,000.00 | $59,050.00 | $559,050.00 |
| 27 | P | $500,000.00 | $49,010.00 | $549,010.00 |
| 28 | Q | $500,000.00 | $59,100.00 | $559,100.00 |
| 29 | R | $500,000.00 | $59,135.00 | $559,135.00 |
| 30 | So | $500,000.00 | $59,099.00 | $559,099.00 |
| 31 | Ti | $499,079.00 | $59,999.00 | $559,078.00 |
| 32 | T | $500,000.00 | $59,050.00 | $559,050.00 |
| 33 | W | $500,000.00 | $59,085.00 | $559,085.00 |
| 34 | W | $500,000.00 | $59,099.00 | $559,099.00 |
| 35 | Xi | $499,058.00 | $0.00 | $499,058.00 |
| 36 | Y | $500,000.00 | $59,075.00 | $559,075.00 |
| 37 | Y | $500,000.00 | $60,222.00 | $560,222.00 |
| 38 | Zh | $500,000.00 | $49,085.00 | $549,085.00 |
| 39 | Zh | $0.00 | $0.00 | $0.00 |
| 40 | Zh | $500,000.00 | $59,099.00 | $559,099.00 |
| 41 | Zh | $500,000.00 | $49,090.00 | $549,090.00 |
| 42 | Zh | $500,000.00 | $59,099.00 | $559,099.00 |
| | | **$20,491,934.00** | **$1,911,901.00** | **$22,403,835.00** |

| NA3PL Misdirected Funds | |
|---|---|
| Destination Account/Entity | Amount |
| Callsocket II LP EWB #3866 | $788,384.38 |
| SFRC EWB #3213 | $1,878,349.28 |
| Immedia SFRC EWB #5523 | $508,182.60 |
| Immedia SFRC EWB #5531 | $140,236.02 |
| SFRC CBB #3213 | $118,442.77 |
| SFRC CBB #2980 | $172,703.15 |
| SFRC (Pay) EWB #4807 | $547,807.60 |
| SFRC dba Trib Tav EWB #6943 | $2,037.13 |
| CS Holding EWB #6398 | $502,731.07 |
| CS III EWB #4682 | $356,925.05 |
| Callsocket LP EWB #3288 | $2,118,263.95 |
| CS LP (Pay) EWB #4849 | $3,809,753.39 |
| Overseas | $689,430.00 |
| Tesh EWB #7008 & #7073 | $954,277.04 |
| JL Gateway LLC EWB #6216 & 8451 | $230,685.99 |
| Magic Ear | $103,023.85 |
| True Agility | $20,225.00 |
| CS LP & CS II LP Receiverships | $74,126.35 |
| SFRC EWB CD #9196 | $97,042.30 |
| SFRC (Chk cashed) | $116,741.75 |
| CCOO - EWB #4690 & SB #8013 | $100,100.00 |
| Central CA Farms EWB #5945 | $6,215.21 |
| Callteks Sec EWB #8782 & #7156 | $187,622.02 |
| City Brand Med EWB #6059 | $9,000.00 |
| True Agility | $104,800.43 |
| This Is There Restaurant | $42,962.87 |
| Kexing Hu | $708,573.55 |
| Ubik Solution Ltd | $1,301,632.63 |
| Shanghai Hemei Inv | $1,046,000.00 |
| Thomas M Henderson | $182,238.70 |
| Qiaoyan Chen EWB #8972 | $802,754.05 |
| West Oak Pl EWB #5036 | $12,500.00 |
| Wifi Rail Citi #7941 | $42,000.00 |
| Geodomain Dev Ventures | $144,956.12 |
| CS LP (Runway) EWB #4443 | $44,500.00 |
| Tribune Tavern | $2,833.33 |
| SRI Nine Mkt Sq Runway | $220,545.11 |
| Callsocket LP PB #8915 | $126,828.82 |
| Callsocket LP WaMu #8166 | $1,000.00 |
| Old Republic Title | $100,876.00 |
| | **$18,416,957.51** |

| TOTAL NA3PL MISAPPROPRIATION | |
|---|---|
| Misdirected Funds = | $18,416,957.51 |
| Syndication Fees = | ($1,911,901.00) |
| **TOTAL MISAPPROPRIATION =** | **$16,505,056.51** |

ATTACHMENT 2

**California Gold Medal, LP**
**Investor Funds**

| # | Investor | Principal | Syndication Fees | TOTAL INVESTMENT WITHDRAWN |
|---|---|---|---|---|
| 4 | Fe | $499,137.50 | $60,000.00 | $559,137.50 |
| 6 | G | | $60,000.00 | $60,000.00 |
| 7 | H | | $60,024.00 | $60,024.00 |
| 8 | H | $500,000.00 | $50.00 | $500,050.00 |
| 9 | H | $499,135.00 | $60,050.00 | $559,185.00 |
| 10 | Jia | $499,099.00 | | $499,099.00 |
| 11 | Jia | | $60,024.00 | $60,024.00 |
| 16 | Li, | $499,058.00 | | $499,058.00 |
| 17 | Li, | | $60,024.00 | $60,024.00 |
| 19 | Li | | $9,974.00 | $9,974.00 |
| 20 | Li | $499,099.00 | $59,974.00 | $559,073.00 |
| 21 | Li | | $60,094.41 | $60,094.41 |
| 22 | Lu | $499,099.00 | $60,004.00 | $559,103.00 |
| 24 | Ly | | $60,024.00 | $60,024.00 |
| 26 | Pa | $499,099.00 | | $499,099.00 |
| 27 | Qi | $499,068.00 | | $499,068.00 |
| 29 | Sh | $499,135.00 | $59,974.00 | $559,109.00 |
| 31 | Su | $499,099.00 | $59,974.00 | $559,073.00 |
| 34 | W | $499,099.00 | | $499,099.00 |
| 37 | W | $499,137.50 | $60,000.00 | $559,137.50 |
| 38 | Xi | $499,098.00 | | $499,098.00 |
| 40 | Yu | $499,135.00 | | $499,135.00 |
| 43 | Zh | $498,910.00 | | $498,910.00 |
| 44 | Zh | $499,099.00 | $59,974.00 | $559,073.00 |
| 45 | Zh | | $60,000.00 | $60,000.00 |
| | UNKNOWN | | $59,974.00 | $59,974.00 |
| | UNKNOWN | | $60,023.00 | $60,023.00 |
| | UNKNOWN | | $60,000.00 | $60,000.00 |
| | | $8,485,507.00 | $1,090,161.41 | $9,575,668.41 |

| CGM Misdirected Funds | |
|---|---|
| Destination Account/Entity | Amount |
| Binary Software Solutions WFB #7884 & BofA#4625 | $852,432.63 |
| Network Technologies BofA #0221 & JPMC #6577 | $1,541,093.75 |
| Ubik Solution Ltd | $630,000.00 |
| NA3PL, LLC EWB #4351 | $13,725.16 |
| | $3,037,251.54 |

| TOTAL CGM MISAPPROPRIATION |
|---|

| | |
|---|---|
| Misdirected Funds = | $3,037,251.54 |
| Syndication Fees = | ($1,090,161.41) |
| **TOTAL MISAPPROPRIATION =** | **$1,947,090.13** |

ATTACHMENT 3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 2

| From: | Matt Henderson <matthew@sfeb5.com> |
|---|---|
| Sent: | 6/20/2014 3:14:12 PM -0700 |
| To: | Peter Hu <peter@sfeb5.com> |
| CC: | Tom Henderson <tom@sfeb5.com> |
| Subject: | July 1st |
| Attachments: | CS.Wkly.6.16.6.20.14.pptx |

Hi Peter,

We need more funds by July 1st. We are completely out of options. Let me explain to you where we're at right now...

Without these funds by July 1st

>    1)   We cannot pay any salaries for CallSocket. If this happens, CallSocket will be out of business. The employees will get up from their desks and quit...all 120 employees. The doors will close.

>    2)   We cannot cover health insurance to the CallSocket employees. We would be breaking Labor Laws with the State of California. If they don't have access to their healthcare benefits, it will be absolute chaos – and then they'll quit.

>    3)   We cannot pay the utilities – power, internet and water – CallSocket can't operate: The doors will close.

>    4)   Just for the above operations (salary, healthcare and utilities), its $500,000 a month.

Some other examples of the current state we're in:

1)   We don't let anyone come up to the 9th floor because people are coming to collect on unpaid bills that are over 3 months old.

2)   We can't pay Marvin – delaying the I-829s

3)   We can't pay Leeds – delaying the I-829s

4)   NA3PL cannot take on any more business until we finish the renovations for US Customs.

5)   CCOO needs $500,000

6)   We cannot afford to fix our elevators – all Three were broken at the same time.

7)   Tom and I eat at the Tavern every day.

Explanation:

US-MH-000016

file:///E:/Report_Files/files/subfolder6/entry%20_24072088182.eml.[AD].html

US-ROI-009102

Why are we risking ALL of our CallSocket investors for one investor who can wait another 10 days to get their funds transferred to NA3PL. With the forecasted investors coming in after July 5th, we will take care of Zhong immediately.

Attached is the forecast for CallSocket for the next three months – after these three months, CallSocket will have a solid foundation and can start operating at breakeven – and shortly after that, start creating real profits. We have a lot of demand for CallSocket – but in order to meet that demand, we have to continue to invest in technologies and people – expanding the entire infrastructure. The PPT provides some examples of how we're trending upwards in every part of the business.

We know it's cutting it close with all of the funds coming in during July...but we can't wait that long, we NEED one investor to keep the lights on (literally). I know this puts you in a bad spot with the investor – but it would be a lot worse if we shut down CallSocket.

Matt Henderson

Global Marketing Director

China Mobile: 186.▮▮▮▮▮▮▮

US Mobile: ▮▮▮▮▮▮▮

## SFRC SAN FRANCISCO REGIONAL CENTER

www.sfeb5.com

| | |
|---|---|
| MIME-Version: | 1.0 |
| X-Mailer: | Microsoft Outlook 14.0 |
| Thread-Index: | Ac+MqzLOr3m+1HgoTGiRVo9JopcEiQ== |
| Delivered-To: | matthew@sfeb5.com |
| Message-ID: | <577ed63800c00ba63974479d3fa6ad79@mail.gmail.com> |
| Content-Type: | multipart/mixed; boundary=001a113433e2195c5a04fc4bd1c3 |

US-MH-000017

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 3

*Community*

**BANK OF THE BAY**®

**PERSONAL FINANCIAL STATEMENT**

180 Grand Ave,      Toll Free: (800) 632-3263
Oakland, CA 94612   Phone:(510) 433-5400      Fax: (510) 433-5431      www.bankcbb.com

## PERSONAL

| Name | Title | Soc. Sec. Number | Date of Birth |
|---|---|---|---|
| THOMAS HENDERSON | PRESIDENT / CEO | | /48 |

| Street Address | City, State, Zip | Home Telephone Number |
|---|---|---|
| 666 MANDANA BLVD | OAKLAND CA 94610 | |

| Email Address | Employer | City, State, Zip |
|---|---|---|
| TOM @ SFEBS.COM | SAN FRANCISCO REGIONAL CTR | OAKLAND, CA 94612 |

| Work Telephone Number | Position | Years with Company |
|---|---|---|
| 510- | PRESIDENT / CEO | 6 YEARS |

## MARITAL STATUS

☒ Unmarried (Single, Divorced, Widowed)  ☐ Separated (Physical or Legal)  ☐ Married*

* If Married, Complete the information and the Contractual Liability Questionnaire below.

## MARRIED PERSON'S CONTRACTUAL LIABILITY QUESTIONNAIRE (ANY "YES" REQUIRES SPOUSE TO SIGN)

Note: If this statement is given for personal credit and for business credit or continuing guaranties, answer questions 1, 2, and 3.

1. If the statement is given for a personal credit decision, the following questions will indicate how you and your spouse will be contractually liable.

| | | |
|---|---|---|
| A) Will you and your spouse be joint applicants by both signing the note? | Yes | No |
| B) Will your spouse be voluntarily liable by signing a continuing guaranty? | Yes | No |

2. If this statement is given to support business credit of your continuing guaranty of another person or any proprietorship, partnership, or corporate credit, answer the following question.

| | | |
|---|---|---|
| A) Will your spouse be voluntarily liable by signing a continuing guaranty? | Yes | No |
| 3. Does your spouse have sole and separate assets? | Yes | No |

## SPOUSE

| Name | Title | Soc. Sec. Number | Date of Birth |
|---|---|---|---|
| | | | |

| Street Address | City, State, Zip | Home Telephone Number |
|---|---|---|
| | | |

| Email Address | Employer | City, State, Zip |
|---|---|---|
| | | |

| Work Telephone Number | Position | Years with Company |
|---|---|---|
| | | |

CBBPFS2014                                    Page 1 of 5



Member FDIC

**ANNUAL INCOME AND EXPENDITURES** (Income from Alimony, Child Support, or Separate Maintenance does not have to be stated unless you want it considered.)

| Annual Income | Annual Expenditures |
|---|---|
| Gross Annual Salary (Applicant) *SEE TAX RETURN* | Federal and State Income Taxes |
| Gross Salary (Spouse) | Property Taxes |
| Interest Income | Rental or Homeowners Dues |
| Dividend Income | Mortgage Payments (Residence) |
| Business Income | Mortgage Payments (Other) |
| Capital Gains | Revolving Credit Lines |
| Rental Income | Alimony I Child Support |
| Investment Income | Insurance (All Types) |
| Other Income | Other Expenditures |
| Total Income | Total Expenditures |

**FINANCIAL STATEMENT**

| Assets | Liabilities |
|---|---|
| Cash in Bank *SEE ATTACHED FINANCIAL STATEMENT* | Accounts Payable |
| Total Cash in other Banks | Notes Payable to Bank |
| Name of Bank(s) | Other Note Payables (SCH 4) |
| Retirement Accounts | Income Tax Payable |
| Accounts Receivables | Other Taxes Payable |
| Note Receivables (SCH 1) | Residence Mortgage (SCH 6) |
| Securities Owned (5CH 2) | Other Mortgages (5CH 6) |
| Life Insurance (SCH 3) | Automobile Loans |
| Real Estate (5CH 6) | Other Installation Loans |
| Partnership Interest (SCH 5) | Describe Other(s) |
| Automobile | Other Liabilities |
| Other Assets | Describe Other(s) |
| Describe Other(s) | Total Liabilities |
| Total Assets | Net Worth (Assets-Liabilities) |

Member FDIC

US-CommunityBotB-001129

## SCHEDULES

### SCHEDULE 1 - Notes Receivable

| Name of Debtor | Collateral | Payable | Maturity Date | Total Amount Due |
|---|---|---|---|---|
| | | per month | | |
| | | per month | | |
| | | per month | | |

### SCHEDULE 2 - Securities Owned

| No. of Shares | Securities Description | Registered Owner | Present Market Value | Exchange |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

### SCHEDULE 3 - Life Insurance

| Insured | Insurance Company | Beneficiary | Face Amount of Policy | Cash Value |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

### SCHEDULE 4 - Notes Payable

| Name of Creditor | Collateral | Payable | Interest Rate | Total Amount Due |
|---|---|---|---|---|
| | | per month | | |
| | | per month | | |
| | | per month | | |
| | | per month | | |

### SCHEDULE 5 - PARTNERSHIP INTERESTS

| Name of Partnership | Type (General or limited) | Cost | Distribution | Market Value | Balance Remain to Fund |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |

Member FDIC    EQUAL HOUSING LENDER

US-CommunityBotB-001130

**SCHEDULE 6 - Real Estate Holding**

1- Property Type:  SF=Single Family    MF=Multi-Family    C=Commercial/Industrial    L=Land    R=Rental    V=Vacation

2- Ownership:  TR=Trust    CP=Community Property    JT=Joint Tenancy    TC=Tenants in Common    SP=Separate Property

For additional properties, reprint this portion of the document and complete, accordingly.

| Needed Information | Residence | Property 1 | Property 2 | Property 3 |
|---|---|---|---|---|
| Property Type -1 | | | | |
| Address-Street | | | | |
| Address-City | | | | |
| Ownership % | | | | |
| Type of Ownership - 2 | | | | |
| Date of Purchase | | | | |
| Purchase Price | | | | |
| Estimated Appraisal Value | | | | |
| 1st Mortgage Amount | | | | |
| 1st Mortgage Name | | | | |
| All Other Mortgages | | | | |
| Annual Property Tax | | | | |
| Annual Payment | | | | |
| Maturity Date | | | | |
| Gross Monthly Income | N/A | | | |

**General Information** - (If married, these questions apply to both you and your spouse)

| | | | | |
|---|---|---|---|---|
| Are any assets held in a trust? | ☐ Yes ☒ No | Are you party to any Claims, Lawsuits, or regulatory proceedings? | ☒ Yes ☐ No | |
| Have you had a repossession? | ☐ Yes ☒ No | Have you been audited by the IRS in the last three years? | ☐ Yes ☒ No | |
| Have you ever had a bankruptcy, lien, or judgment against you, personal or business? | ☐ Yes ☒ No | Do you have any credit or pending loan applications at other financial institution? | ☐ Yes ☒ No | |
| Are any assets pledged or debts secured except as shown? | ☐ Yes ☒ No | Do you guarantee or co-sign on any other debt? | ☐ Yes ☒ No | |
| Are you leasing any real or personal property? | ☐ Yes ☒ No | Have you ever been convicted of a felony? | ☐ Yes ☒ No | |
| Do you anticipate any substantial reductions of your Income as listed herein during the loan? | ☐ Yes ☒ No | Are you an executive, director, or principal shareholder of any financial Institution? | ☐ Yes ☒ No | |

If "Yes", please explain in detail in the Additional Comments section located on page 5.



US-CommunityBotB-001131

## APPLICANT'S AUTHORIZATION STATEMENT

THE INFORMATION CONTAINED IN THIS STATEMENT IS PROVIDED TO INDUCE BANK TO EXTEND OR CONTINUE THE EXTENSION OF CREDIT TO THE UNDERSIGNED (I/WE) OR TO OTHERS UPON THE GUARANTEE OF THE UNDERSIGNED. I/WE ACKNOWLEDGE AND UNDERSTAND THAT THE BANK IS RELYING ON THE INFORMATION PROVIDED HEREIN IN DECIDING TO GRANT OR CONTINUE CREDIT OR TO ACKNOWLEDGE ADDRESS OR EMPLOYMENT AND OF ANY MATERIAL ADVERSE CHANGE (1) IN ANY INFORMATION CONTAINED IN THIS STATEMENT OR (2) IN MY/OUR FINANCIAL STATEMENT. THIS SHOULD BE CONSIDERED AS A CONTINUING STATEMENT AND MATERIALLY CORRECT. IF I/WE FAIL TO NOTIFY THE BANK AS REQUIRED ABOVE, OR IF ANYOF THE INFORMATION HEREIN SHOULD PROVE TO BE INACCURATE OR INCOMPLETE IN ANY MATERIAL RESPECT, THE BANK MAY DECLARE THE INDEBTEDNESS OF THE UNDERSIGNED OR THE INDEBTEDNESS GUARANTEED BY THE UNDERSIGNED, AS THE CASE MAY BE, IMMEDIATELY DUE AND PAYABLE. THE BANK IS AUTHORIZED TO MAKE ALL INQUIRIES IT SEEMS NECESSARY TO VERIFY THE ACCURACY OF THE INFORMATION CONTAINED HEREIN AND TO DETERMINE MY/OUR CREDIT WORTHINESS. I/WE AUTHORIZE ANY PERSON OR CONSUMER REPORTING AGENCY TO GIVE THE BANK ANY INFORMATION IT MAY HAVE ON ME/US. I/WE AUTHORIZE THE BANK TO ANSWER QUESTIONS ABOUT ITS CREDIT EXPERIENCE WITH ME/US. AS LONG AS I/WE HAVE ANY OBLIGATION OR GUARANTEE OUTSTANDING TO THE BANK, I/WE SHALL SUPPLY ANNUALLY AN UPDATED FINANCIAL STATEMENT. THIS PERSONAL FINANCIAL STATEMENT AND ANY OTHER FINANCIAL INFORMATION THAT I/WE GIVE THE BANK SHALL BE ITS PROPERTY. IF THIS IS A JOINT FIANCIAL STATEMENT, THESE REPRESENTATIONS AND WARRANTIES ARE MADE BY EACH OF US. APPLICANT(S) ACKNOWLEDGE THAT KNOWINGLY MAKING A FALSE STATEMENT OR OVERVALUING A SECURITY TO OBTAIN A LOAN FROM THE BANK CAN RESULT EITHER IN A FINE OF UP TO $10,000 AND /OR IMPRISONMENT FOR NOT MORE THAN FIVE YEARS UNDER 18 USC 1001 OR IN A FINE OF NOT MORE THAN $1,000,000 AND/OR IMPRISONMENT FOR NOT MORE THAN TWENTY YEARS UNDER 18 USC 1014.

I/WE ACKNOWLEDGE THAT PRIOR TO SIGNING THIS INDIVIDUAL FINANCIAL STATEMENT, I/WE HAVE READ, UNDERSTAND, AND AGREE TO ALL TERMS AND CONDITIONS IN THE ABOVE PARAGRAPH.

| Authorized Signature (Applicant) *Thomas M Henderson* | Authorized Signature (Applicant) |
|---|---|
| Print Name THOMAS M HENDERSON | Print Name |
| Title Pres/CEO  Date 1/22/16 | Title  Date |

Additional Comments:

### For Bank Use Only

| Officer Name and Number | Office Name and Number | Date Received |
|---|---|---|
| | | |

Member FDIC

| TOM HENDERSON BALANCE SHEET | |
| --- | --- |

As of 7/1/2015

| ASSETS | | Amount |
| --- | --- | --- |
| Cash | | $750,000 |
| EastWest Bank Checking - San Francisco Regional Center | $750,000 | |
| Real Estate | | $62,226,665 |
| CCOO (50% Owner of Real Estate) - 1833 10th Avenue, Oakland, CA | $4,000,000 | |
| Tribune Tower - 409 13th Street, Oakland, CA | $14,400,000 | |
| Horizon - 1700 20th Avenue, Oakland, CA | $8,750,000 | |
| Dufwin Building - 519 17th, Oakland, CA | $4,693,333 | |
| 1750 Broadway, Oakland, CA | $2,933,333 | |
| I Magnin - 2001 Broadway, Oakland, CA | $18,000,000 | |
| Jack London Gateway - 800-900 Market, Oakland, CA | $9,450,000 | |
| San Francisco Regional Center - Equity Interests in Companies | | $19,500,000 |
| CCOO (50% Owner of Business) | $7,500,000 | |
| CallSocket, LP | $5,000,000 | |
| North America 3PL, LLC (50% interest in business) | $5,000,000 | |
| Tribune Tavern | $2,000,000 | |
| Automobiles | | $10,000 |

| TOTAL ASSETS | $82,486,665 |
| --- | --- |

| LIABILITIES | Amount |
| --- | --- |
| Real Estate Debt | $23,922,788 |

| TOTAL LIABILITIES | $23,922,788 |
| --- | --- |

| TOTAL NET WORTH | $58,563,878 |
| --- | --- |

Thomas n Henderson
1/22/16

US-CommunityBotB-001134

| Property / Address | Square Footage | Property Type | Ownership | Ownership % | Purchase Date | Amount Paid | Market Value | Tom Henderson Value | Lender | Loan Balance | Tom Henderson Portion |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | REAL ESTATE OWNED - PERSONAL | | | | | | | |
| CCOO 1833 10th Avenue Oakland, CA | 25,009 (99 beds) | Nursing Home | Protean Health Services, Inc. | 50% | 6/22/2011 | $3,382,130 | $8,000,000 | $4,000,000 | | $0 | $0 |
| Tribune Tower 409 13th Street Oakland, CA | 90,000 | Office | CallSocket Holding Company, LLC | 80% | 12/5/2011 | $8,000,000 | $18,000,000 | $14,400,000 | Torchlight | $6,500,000 | $5,200,000 |
| BHD 1700 20th Street Oakland, CA | 92,000 | Warehouse | Berkeley Healthcare Dynamics, LP | 50% | 11/9/2012 | $8,250,000 | $17,500,000 | $8,750,000 | East West Bank | $6,174,743 | $3,087,372 |
| Dufwin Building 519 17th Street Oakland, CA | 53,700 | Office | CallSocket II, LP | 53% | 12/7/2012 | $4,326,000 | $8,800,000 | $4,693,333 | Opus Bank | $2,650,000 | $1,413,333 |
| 1750 Broadway Oakland, CA | 24,267 | Office | CallSocket II, LP | 53% | 10/26/2012 | $3,700,000 | $5,500,000 | $2,933,333 | Opus Bank | $2,650,000 | $1,413,333 |
| I Magnin 2001 Broadway Oakland, CA | 58,777 | Office | CallSocket III Holding Company, LLC | 100% | 6/26/2013 | $9,800,000 | $18,000,000 | $18,000,000 | Midland Loan Services | $7,600,000 | $7,600,000 |
| Jack London Gateway 800-900 Market Street Oakland, CA | 58,555 | Retail | JL Gateway, LLC | 75% | 12/17/2014 | $9,800,000 | $12,600,000 | $9,450,000 | Thorofare Capital | $6,945,000 | $5,208,750 |
| Total | 402,308 | | | | Total Value | $47,258,130 | $88,400,000 | $62,226,665 | Total RE Debt | $32,519,743 | $23,922,788 |



US-CommunityBotB-001135

| Tom Henderson Equity | Term (yrs) |
|---|---|
| $4,000,000 | |
| $9,200,000 | 5 years (due 11/16) |
| $5,662,629 | 5 years (due 11/19) |
| $3,279,999 | 3 years (due 3/18) |
| $1,520,000 | 3 years (due 3/18) |
| $10,400,000 | 4 years (due 8/17) |
| $4,241,250 | 2 years (due 12/16) |
| **$38,303,878** | |